# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-414V
**Filed: August 19, 2021**
PUBLISHED

| | |
|---|---|
| JOHNNY MATTHEWS,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>               Respondent. | Special Master Horner<br><br>Dismissal; Evidence of Vaccination; Influenza Vaccine; Guillain-Barre Syndrome (GBS) |

*Renee J. Gentry*, Vaccine Injury Clinic, George Washington University Law School, Washington, DC, for petitioner.
*Ryan Daniel Pyles*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION[1]

On March 19, 2019, petitioner, Johnny Matthews, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012), alleging that he suffered Guillain-Barre Syndrome ("GBS") caused by his receipt of an influenza ("flu") vaccination "on or around" November 10, 2013.  (ECF No. 1, p. 1.)  Petitioner now moves for a finding of fact that he did receive a flu vaccination on or about November 10, 2013, as alleged, despite not being able to produce a vaccine administration record. (ECF No. 50.)  Respondent opposes petitioner's motion and cross-moves for dismissal of this case due to petitioner's failure to establish that he received a vaccination. (ECF No. 51.)  For the reasons discussed below, I find that there is not preponderant evidence that petitioner received a vaccination covered by this program and therefore dismiss this petition.

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

1

**I.     Procedural History**

This case was initially filed by petitioner as a *pro se* petitioner and was originally assigned to Special Master Sanders. His current counsel, Ms. Gentry, was substituted as counsel on April 29, 2019. (ECF No. 14.)  The case was subsequently reassigned to me on August 28, 2019. (ECF No. 28.)

Petitioner's initial filings are inconsistent with respect to the date of petitioner's alleged vaccination.  His petition at turns references a date of either November 1, 2013, or November 10, 2013. (ECF No. 1, p. 1.)  A separate filing, also captioned as a petition, indicates the vaccination occurred on an unspecified date in October 2013. (ECF No. 7, p. 1.)  Petitioner later filed medical records and an affidavit on October 14, 2019. (ECF No. 30; Exs. 1-5.)  His affidavit describes the circumstances of his vaccination and indicates it was administered in connection with a surgery that occurred on November 18, 2013. (Ex. 5, p. 1.)

After investigating whether additional records exist, petitioner ultimately filed a Statement of Completion on February 7, 2020. (ECF No. 36.)  However, respondent filed a status report on March 3, 2020, indicating that the records filed to that point lacked a record of the vaccination alleged to be at issue and that certain other records appeared incomplete. (ECF No. 37.)

Petitioner subsequently filed further medical records. (ECF Nos. 38-39, 44; Exs. 4, 6-9.)  Respondent then filed his Rule 4(c) Report on December 16, 2020, principally raising the issue that petitioner's vaccination was still not adequately documented. (ECF No. 48.)  In response, petitioner filed a status report indicating that "[t]here are no other outstanding records.  Petitioner believes a determination by the Special Master will be necessary as to whether the evidence, as a whole, supports the receipt of an influenza vaccination."  (ECF No. 49.)

On February 23, 2021, petitioner filed a motion for a finding of fact. (ECF No. 50.) Petitioner contends that the weight of the circumstantial evidence supports a finding that petitioner received a flu vaccination on or about November 10, 2013. (*Id*. at p. 5.)  On March 9, 2021, respondent filed a response opposing petitioner's motion and also asserting a cross-motion for dismissal of the case for failure to establish receipt of a vaccination. (ECF No. 51.)  Petitioner filed a reply on March 16, 2021. (ECF No. 52.)

I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve this issue without a hearing. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Secretary of Health & Human Services*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record."). Accordingly, this issue is now ripe for resolution.

## II. Factual History

I have reviewed the entirety of petitioner's medical records as filed in this case; however, it is not necessary to discuss these records in full detail. The only question at issue is whether petitioner received a flu vaccination prior to onset of his GBS. The fact of his GBS diagnosis and the subsequent course of his illness are not in dispute on this motion. This factual summary will focus exclusively on points bearing on whether petitioner received a flu vaccination as alleged.

Petitioner presented to the Carolinas Hospital System emergency department on October 13, 2013, for lower back pain assessed as an acute lumbar strain. (Ex. 1, p. 11.) A screening assessment indicated "no" in response to the prompt "flu vaccine this season." (*Id*. at 13.) Petitioner returned to the same emergency department on October 28, 2013, for scabies. (*Id*. at 26-27.) The same screening question was again marked "no" regarding whether petitioner had a vaccine for the current flu season. (*Id*. at 29.)

On November 10, 2013, petitioner again returned to the Carolinas Hospital emergency department. (*Id*. at 40.) He presented with a swollen painful toe. (*Id*.) This time the screening question reportedly elicited a "yes" as to whether petitioner had received his flu vaccine for the year. (*Id*. at 43.)

On November 13, 2013, petitioner presented to the McLeod Regional Medical Center ("MRMC") emergency department for cough, congestion, and right-side pain.[2] (Ex. 4, pp. 1903-11.) He was negative for influenza and diagnosed with a "cough" with instructions to follow up with a primary care provider. (*Id*.) There is no indication of any screening for vaccination status.

On November 18, 2013, petitioner returned to the Carolinas Hospital emergency department with a severe right forearm wound sustained from a knife attack. (Ex. 1, p. 98.) The wound was approximately 10cm x 4 cm in area, 4 cm deep, and there was a chip in the bone. (*Id*. at 117.) Petitioner was admitted for a surgical repair. (*Id*. at 117-18.) As with his prior November 10, 2013 encounter, the Carolinas Hospital screening questions again reportedly elicited a "yes" in response to whether petitioner had his seasonal flu vaccination. (*Id*. at 111.) Significantly, however, petitioner avers that he later received his flu vaccination in the course of this hospitalization. (Ex. 5, p. 1.)

Petitioner describes his flu vaccination has having been administered by a nurse in the emergency room in his left arm while another nurse was sewing up his right arm after his surgery.[3] (Ex. 5, p. 1.) However, petitioner's operative report indicates that his

---

[2] Some of petitioner's medical records from this provider reflect an alias. (Ex. 6, p. 3.)

[3] Of note, respondent observes that in the specific context petitioner describes a tetanus vaccination would have been more likely to be administered than a flu vaccination. (ECF No. 51, n. 4.) However, this petition was filed more than five years after November 18, 2013. As respondent explained in this Rule 4 Report, the petition was timely filed relative to petitioner's allegation of a flu vaccine having been administered because GBS following flu vaccination was added to the Vaccine Injury Table in 2017. (ECF

3

surgery occurred in the operating room rather than the emergency room.  He was under anesthesia and intubated during the surgery and the wound was stapled, splinted, dressed, and wrapped in the operating room while petitioner remained under anesthesia. (Ex. 1, pp. 117-18.)  After the surgery he was transferred to the post-anesthesia care unit ("PACU") not the emergency room. (*Id*.)

Petitioner's November 18, 2013 emergency department record does not reflect that a flu vaccine was administered.  Moreover, itemized billing records have been filed for the hospital stay at which petitioner avers his vaccination occurred and these records likewise reflect no charge for a flu vaccine. (Ex. 7.)  In fact, the discharge summary for petitioner's November 18, 2013 admission to Carolinas Hospital specifically indicates that no flu vaccine was administered during his admission. (Ex. 1, p. 139.)  Additionally, a November 21, 2013 form hand signed by a nurse check marked that petitioner declined to receive the flu vaccination. (Ex. 1, p. 107.)

Petitioner returned to the Carolinas Hospital emergency department on November 25, 2013, complaining of numbness and tingling in his legs. (Ex. 1, p. 53.)  The screening assessment indicated "no" in response to the prompt "flu vaccine this season." (*Id*. at 170.)  Petitioner was discharged with a diagnosis of "hyperventilation syndrome." (*Id*. at 167.)  Two days later, petitioner sought care from MRMC. (Ex. 4, p. 1986-90.)  His vaccinations were noted to be "current" without specificity. (*Id*. at 1987.)  Petitioner left against medical advice. (*Id*. at 1988.)  Petitioner returned to Carolinas Hospital on November 28, 2013. (Ex. 1, p. 185.)  Carolinas Hospital again recorded that petitioner had not received his annual flu vaccination. (*Id*. at 192.)  The assessment was neuropathy and petitioner was to follow up with a neurologist. (*Id*. at 188-89.)

Petitioner was subsequently admitted to MRMC on November 29, 2013, for what was later diagnosed as GBS. His flu vaccination status upon admission was confirmed as indicating no flu vaccine for the current flu season. (Ex. 4, pp. 633, 636.)  An order was entered to administer a flu vaccination at discharge. (Ex. 4, p. 2084.)  Petitioner subsequently had a neurology consultation on December 6, 2013. (Ex. 9, pp. 215-16.)  At that time, petitioner was intubated and sedated and his girlfriend provided a history that noted an upper respiratory infection preceding petitioner's condition, but included no mention of a flu vaccination. (*Id*.)  Petitioner was given a diagnosis of probable GBS to be confirmed later with further diagnostic tests. (*Id*.) This assessment was made without reference to any vaccination history.

Subsequently, a notation appears in petitioner's medical records dated December 12, 2013 instructing a nurse to call the Carolinas Hospital to determine whether a flu shot had been administered during petitioner's prior admission. (Ex. 9, p. 307.) A separate notation includes a checkmark and the word "done." (*Id*.)  Clinical notes from the same date indicate: "contacted John Pennstrom, pharmacist at Carolinas Health System per MD order to find out if pt received flu shot prior to discharge. Stated there are no records of pt receiving the vaccination." (Ex. 4, p. 298.)

---

No. 48, n. 1.)  Accordingly, even if petitioner amended his petition to allege administration of a tetanus vaccination, he still would not be able to pursue his claim.

No further notation is made regarding petitioner's vaccination status until December 21, 2013, when a handwritten note indicates "recent shot followed by Guillain-Barre Syndrome" and instructs that the flu vaccine should be added to petitioner's allergy list. (Ex. 9, p. 294.)  The basis for this notation is not clear.  Though intubated and previously sedated, as of December 21, 2013, petitioner was awake and communicating by answering yes or no questions by nodding or shaking his head.  He also had a communication board. (*E.g*. Ex. 4, p. 279.)  However, petitioner's detailed clinic notes contain no indication that petitioner provided this information.  It is not until his date of discharge, January 18, 2014, that petitioner is recorded as having reported that he was previously vaccinated.[4] (Ex. 4, p. 253.)

Following the December 21, 2013 notation that petitioner's GBS followed vaccination, his record was updated to include the flu vaccine among his allergies on the basis that his GBS was a reaction to the flu vaccine. (Ex. 4, p. 533.)  At that time, Dr. Duncan also discontinued the instruction that petitioner receive the flu vaccine upon discharge. (Ex. 9, p. 538.)  A follow up consultation for pain management on January 7, 2014 indicated under allergies that petitioner "is now no longer a candidate for the flu shot," but did not discuss petitioner's prior vaccination history or the etiology of his GBS. (Ex. 4, p. 525.)

Petitioner subsequently reported to other providers that his GBS was secondary to a flu vaccination (Ex. 3, p. 18) and the flu vaccine continued to be listed as an allergy (*e.g*. Ex. 9, p. 7).

### III.   Legal Standard

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury.  Petitioner has the burden of demonstrating the facts necessary for entitlement to an award by a "preponderance of the evidence." § 300aa-12(a)(1)(A).  Under that standard, the existence of a fact must be shown to be "more probable than its nonexistence." *In re Winship*, 397 U.S. 358, 371 (1970) (Harlan, J., concurring).

The Vaccine Act states that "[t]he special master or court may not make such a finding [of eligibility and compensation] based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." § 300aa-13(a)(1).  Nonetheless, special masters are not bound by the reports, summaries, or conclusions contained in the medical records.  § 300aa-13(b)(1).  Rather, the special master must consider the entire record. *Id*.  Importantly, the fact of a vaccination need not itself be proven by medical records or medical opinion.  *See, e.g. Wonish v. Sec'y of Health &*

---

[4] Petitioner likewise indicated in one of his initial pleadings that he first informed the physicians at MRMC of his prior flu vaccination in January of 2014.  (ECF No. 7, p. 1.)

*Human Servs*., No. 90-667V, 1991 WL 83959, at *4 (Cl. Ct. Spec. Mstr. May 6, 1991)(stating with regard to § 300aa-13(a)(1) that "it seems obvious then that not all elements must be established by medical evidence" and that "vaccination is an event that in ordinary litigation could be established by lay testimony. Medical expertise is not typically required.") Nor, for that matter, does it necessarily have to be evidenced by contemporaneous documentation. *See, e.g. Centmehaiey v. Sec'y of Health & Human Servs*., 32 Fed. Cl. 612, 621 (1995), (noting that "the lack of contemporaneous documentary proof of vaccination, however, does not necessarily bar recovery."), *aff'd* 73 F. 3d 381 (Fed. Cir. 1995); *see also Woodson v. Sec'y of Health & Human Servs*., No. 91-263V, 1992 WL 59707, at *2 (Fed. Cl. Spec. Mstr. Mar. 5, 1992)(noting that "[t]he petition should not be dismissed *as a matter of law*, merely because there is no documentary evidence that the vaccination took place and [petitioner] is the only witness claiming personal knowledge of the vaccination. Her testimony on this point must be weighed in the context of the entire record.").

However, medical records do ordinarily "warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs., 993* F.2d 1525, 1528 (Fed.Cir.1993). Where subsequent testimony conflicts with contemporaneous medical records, special masters frequently accord more weight to the medical records. *See, e.g., Reusser v. Sec'y of Health & Human Servs.,* 28 Fed. Cl. 516, 523 (1993) ("[W]ritten documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later."); *see also Vergara v. Sec'y of Health & Human Servs*., 08-882V, 2014 WL 2795491, *4 (Fed. Cl. Spec. Mstr. July 17, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded later in medical histories, affidavits, or trial testimony.").

Special masters are cautioned against favoring contemporaneous records "reflexively" and must not overemphasize individual records at the expense of a comprehensive evaluation of the entire record. *Shapiro v. Sec'y of Health & Human Servs*., 101 Fed. Cl. 532, 539-40 (2011). "Medical records are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Human Servs*., No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006). However, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy v. Sec'y of Health & Human Servs*., 23 Cl. Ct. 726, 733 (Fed. Cl. 1991), *aff'd* 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992).

There are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Human Servs*., 69 Fed.Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie v. Sec'y of Health & Human Servs*., No. 03–1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally

consistent") (*quoting Murphy*, 23 Cl.Ct. at 733). However, when witness testimony is offered to overcome the weight of contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

## IV.   Party Contentions

The parties largely agree on the applicable legal standard, but differ significantly in their interpretations of the record evidence.  Petitioner concedes that proof of vaccination is a requirement of the Vaccine Act, but stresses that a specific record of vaccination is not required. (ECF No. 52, p. 1.)  Respondent agrees that contemporaneous documentation of vaccination "is not absolutely required in all cases," but stresses that contemporaneous documentation from a healthcare provider "is the best evidence that a vaccination occurred." (ECF No. 51, p. 8 (quoting *Gambo v. Sec'y of Health & Human Servs.*, No. 13-691V, 2014 WL 7739572, at *3 (Fed. Cl. Spec. Mstr. Dec. 18, 2014)).)

In suggesting the record evidence as a whole preponderates in favor of a vaccination having been administered, petitioner focuses principally on the fact that the flu vaccine was documented in petitioner's medical records as an allergy or contraindication during his hospitalization for GBS and within two months after the vaccination is alleged to have occurred. (ECF No. 52, p. 2.)  In spite of other inconsistent records, petitioner asserts in effect that this evidences an understanding by the treating physicians that petitioner's GBS was vaccine-caused, thereby evidencing the fact of the vaccination. (*Id*.)  Petitioner asserts that the notation of an allergy in the medical records should carry greater weight than prior "checkbox" notations regarding the fact of vaccination because the determination that an allergy is present is a more medically significant determination that "can have deadly ramifications if missed." (*Id*.) Petitioner indicates that he "is not asking the Special Master to rely on his testimony alone, rather to look at the record as a whole.  Is Mr. Matthews's receipt of an influenza vaccination on or before November 10, 2013 'more probable than its nonexistence'? Petitioner asserts that it is." (*Id*. at 3.)

Respondent contends that petitioner's interpretation of the allergy notation is both speculative and not the best explanation for the contraindication. (ECF No. 51, pp. 9-10.)  Respondent also challenges the credibility of petitioner's own description of his vaccination as contained in his affidavit and further stresses that in his various filings petitioner has alleged inconsistent dates of vaccination. (*Id*. at pp. 8-10.)  In any event, respondent disputes that petitioner's own affidavit is sufficient to carry petitioner's burden of proof. (*Id*. at pp. 10-11.)   Respondent contends that petitioner's allegations are lacking sufficient context and particularity to constitute evidence that any vaccination occurred and concludes that there is not preponderant evidence of any vaccination. (*Id*. at pp. 8, 10.)

7

### V.     Analysis

As explained above, petitioner must demonstrate that a vaccine was administered but need not necessarily file a vaccine administration record so long as there is preponderant evidence that the vaccination occurred.  Considering the record as a whole, several aspects of petitioner's medical history warrant discussion, namely: inconsistent references to petitioner's vaccination status prior to onset of his GBS; the implausibility of the more detailed account of vaccination provided by petitioner; references to efforts made to ascertain petitioner's vaccination status during his hospitalization for his GBS; and the undisclosed basis for the references to petitioner becoming ineligible for future flu vaccinations.  Considering the record as a whole, there is not preponderant evidence that petitioner received a flu vaccination at any point in the days, weeks, or months preceding onset of his GBS.

Petitioner's contemporaneous medical records reflect that he was inconsistent during the relevant period in reporting whether he received a flu vaccine for the 2013-14 flu season. (*Compare* Ex. 1, p. 13 (no on 10/13/13); Ex. 1, p. 29 (no on 10/28/13); Ex. 1, p. 43 (yes on 11/10/13); Ex. 1, p. 111 (yes on 11/18/13); Ex. 1, p. 170 (no on 11/25/13); Ex. 4, p. 1988 (vaccinations "current"); Ex. 1, p. 192 (no on 11/28/13); Ex. 4, pp. 633, 636 (no on 11/29/13); Ex. 4, p. 253 (yes on 1/18/14).)  Petitioner argues that these types of screening questions regarding vaccination history "may or may not" constitute the type of medical record entry that warrants special weight based on the common understanding that, with proper treatment hanging in the balance, "accuracy has an extra premium." (ECF No. 52, p. 2 (citing *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1383 (Fed. Cir. 2009).)  Importantly, however, even if these records are not entitled to added weight, petitioner has not provided any specific reason for supposing that the inaccuracy and inconsistency of these reports originates with the medical providers in taking petitioner's history rather than with petitioner in providing it. Significant to that point, petitioner is separately noted in his medical records as being a "difficult historian." (Ex. 1, p. 185.)  Moreover, in his filings in this case petitioner continues to be inconsistent in identifying the time by which he alleges that he was vaccinated for the 2013-14 flu season, leaving it impossible to even conclude which reports would have been in error. (*Compare* ECF No. 1, p. 1. (alleging vaccination on or about November 10, 2013); ECF No. 7, p. 1 (alleging vaccination in October 2013); Ex. 5, p. 1 (alleging vaccination after surgery on November 18, 2013).)

Additionally, these inconsistent notations were generated at two different facilities on nine different occasions and both confirm and deny that petitioner was vaccinated. Many of these notations would have to be incorrect to allow for the record to support any of petitioner's various allegations.  For example, assuming *arguendo* petitioner's affidavit accurately placed his vaccination post-surgery on November 18, 2013, five separate notations regarding his vaccination status would necessarily be incorrectly recorded.  (Ex 1, p. 43 (yes on 11/10/13); Ex. 1, p. 111 (yes on 11/18/13); Ex. 1, p. 170 (no on 11/25/13); Ex 1, p. 192 (no on 11/28/13); Ex. 4, pp. 633, 636 (no on 11/29/13).) Moreover, these notations would not all reflect the same error – in some instances incorrectly affirming vaccination while in others later incorrectly disclaiming vaccination.

Accordingly, petitioner's inconsistency is not easily explained by recordkeeping error. Nor are his various reports readily harmonized to any of his allegations. Thus, without more, these notations cannot serve as evidence that any vaccination occurred.

As discussed above, petitioner recalls that he was vaccinated at Carolinas Hospital following his right forearm surgery. (Ex. 5, p. 1.) Petitioner describes his flu vaccination as having been administered by a nurse in the emergency room in his left arm while another nurse was sewing up his right arm after his surgery. (*Id*.) However, petitioner's operative report indicates that his surgery occurred in the operating room rather than the emergency room. He was under anesthesia and intubated during the surgery and the wound was stapled, splinted, dressed, and wrapped in the operating room while petitioner remained under anesthesia. (Ex. 1, pp. 117-18.) After the surgery he was transferred to the post-anesthesia care unit ("PACU") not the emergency room. (*Id*.) Moreover, in the course of his subsequent medical history, his wound was later assessed at MRMC. (Ex. 4, pp. 1980-81.) These records further confirm petitioner's wound was stapled, not sutured. (*Id*.) The circumstances petitioner describes simply do not appear to be possible in light of what his hospitalization records show to have been his course of care.[5]

Additionally, while petitioner has been consistent in alleging that he was vaccinated at Carolinas Hospital, the contemporaneous medical records filed from this provider are not, on the whole, consistent with that allegation.[6] Apart from lacking a specific vaccine administration record, the records generated during petitioner's November 18, 2013 hospitalization at Carolinas Hospital (or any of his other emergency department encounters around that time) are completely lacking for any notation by any of the treating doctors or nurses discussing, contemplating, ordering, or administering a flu vaccination to petitioner during the course of his care. Further to this point, itemized billing records have been filed for the hospital stay at which petitioner avers his vaccination occurred and these records reflect no charge for a flu vaccine. (Ex. 7.)

In fact, petitioner's recollection is flatly contradicted by the specific confirmation contained in the hospital records that petitioner declined to be vaccinated during this hospitalization and that no flu vaccination was administered. (Ex. 1, pp. 107, 139.) Thus, it is not merely the case that petitioner's vaccine administration record is absent. Rather, the contemporaneous medical records explicitly deny any vaccination

---

[5] In his recitation of the facts of this case, respondent also stresses several points which he intimates should weigh against petitioner's credibility as a witness. (ECF No. 51, pp. 2-8.) In response, petitioner stresses that this case should not turn on whether petitioner is a sympathetic victim. (ECF No. 52, p. 3.) In the interest of completeness, I note that due to the facial unreliability of petitioner's account it is not necessary to reach the question of petitioner's credibility with regard to the specific points raised by respondent.

[6] Of note, although petitioner could theoretically have received a vaccination from a pharmacy or in some other context, he has consistently maintained that his vaccination was administered at Carolinas Hospital. (ECF No. 1, p. 1; ECF No. 7 p. 1; Ex. 5, p. 1.) Moreover, petitioner has been given ample opportunity to produce records from any and all relevant care providers and has not filed any vaccination record from any other provider.

consistent with petitioner's recollection. That is, there is not merely absence of evidence; there is evidence of absence. *Accord Murphy*, 23 Cl. Ct. at 733 (explaining that "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") Even if petitioner is not required to prove the fact of his vaccination with an administration record, this must necessarily weigh against his allegation.

As noted above, petitioner seeks to rely primarily on the fact that his treaters at MRMC subsequently recorded that he was allergic to the flu vaccination as evidence that they concluded his GBS was vaccine-caused and that he had therefore been previously vaccinated. However, this conclusion is only as valuable as the information underlying it. Medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. §300aa-13(b)(1); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed.Cl. 706, 746 n.67 (2009) ("there is nothing ... that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). The views of treating physicians should also be weighed against other, contrary evidence also present in the record. *Hibbard v. Sec'y of Health & Human Servs.*, 100 Fed.Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Caves v. Sec'y of Health & Human Servs.*, 100 Fed.Cl. 119, 136 (2011), *aff'd*, 463 Fed.Appx. 932 (Fed. Cir. 2012); *Veryzer v. Sec'y of Health & Human Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd,* 100 Fed.Cl. 344, 356 (2011), *aff'd without opinion*, 475 Fed.Appx. 765 (Fed. Cir. 2012).

In the context of the record of this case, the fact that the physicians at MRMC recorded petitioner as allergic to the flu vaccine is not persuasive evidence that he received such a vaccine. As explained above, petitioner's initial neurology appointment generated a GBS diagnosis without any reported history of flu vaccination. (Ex. 9, pp. 215-16.) Accordingly, the fact of a vaccination was not a factor in initially arriving at the GBS diagnosis. MRMC subsequently sought to confirm whether petitioner had been vaccinated at Carolinas Hospital and specifically confirmed there was no record of vaccination. (Ex. 4, p. 298.) And, indeed, as noted above, the Carolinas Hospital records filed in this case explicitly indicate that no flu vaccine was administered during petitioner's hospitalization. (Ex. 1, pp. 107, 139.)

The source of information ultimately relied upon in subsequently noting to the contrary that petitioner's GBS followed a flu vaccine is not documented (Ex. 9, p. 294); however, to the extent that source of information would have been petitioner himself, his contemporaneous medical records document, as explained above, that he already had an established pattern of inconsistently reporting whether he had received a flu vaccine that year. Accordingly, reliance on a single, additional instance of this unreliable reporting by the MRMC treaters does not provide any meaningful evidence buttressing petitioner's claim, especially where the treaters initially arrived at their diagnosis without that information and then tried and failed to confirm the vaccination. Moreover, given

that MRMC confirmed that Carolinas Hospital had no record of vaccination, the later notation that petitioner's GBS was preceded by a flu vaccine is conspicuous for the lack of any additional detail or indication of when petitioner purportedly received the vaccination.  Absent that information, it is impossible to glean whether the report provided to the MRMC staff matched what petitioner now avers in this case or assess whether the resulting conclusion of a cause-and-effect relationship was reliably reached.[7]

It is also worth noting, as petitioner stresses, that the act of marking something as an allergy or as contraindicated is a precaution against *future* harm.  In that regard, petitioner's GBS need not necessarily have been vaccine-caused to warrant the precaution. The CDC recognizes that the flu vaccine broadly carries "a very small increased risk" of GBS post-vaccination.[8] *Accord* National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 82 Fed. Reg. 6294-01, 6295 (Jan. 19, 2017) (explaining that "the Secretary found that there was compelling, reliable, and valid medical and scientific evidence of an association between the 2009 H1N1 vaccine and GBS . . . To date, the H1N1 antigen has been included in all seasonal influenza vaccines beginning with the 2010-2011 flu season.")  Thus, individuals who have

---

[7] *See Gerard v. Sec'y of Health & Human Servs.*, No. 08-786V, 2013 WL 6916045 (Fed. Cl. Spec. Mstr. Dec. 16, 2013), *reconsideration granted* 2014 WL 4293342 (Fed. Cl. Spec. Mstr. Aug. 8, 2014).   Like this case, the *Gerard* petitioner sought to prove in the absence of a vaccine administration record that he had received a flu vaccine prior to onset of his GBS based on circumstantial medical record notations. Initially the special master observed that there were inconsistent entries in the medical records insofar as a nurse had recorded one entry listing the flu vaccine under petitioner's allergies and another documenting that petitioner had a "reaction" to his flu vaccine while also documenting that the petitioner had not received a flu vaccine.  2013 WL 6916045 at *2-3.  The special master reasoned that the contradiction was explained by the fact that the flu vaccine is contraindicated for individuals who have previously had GBS. *Id*. at n. 4.  Reviewing the medical records as a whole, the special master concluded that there was not preponderant evidence of any flu vaccine having been administered despite, *inter alia*, the notation that the petitioner was allergic to the flu vaccine.  However, the petitioner subsequently moved for reconsideration and was provided an opportunity to file additional medical records.  On reconsideration, the special master observed that multiple of petitioner's medical records indicated not merely that petitioner was "allergic" to the flu vaccine, but that petitioner had in fact "had an 'allergic reaction to the flu shot in the form of GBS.'" *Id*. at *4. The special master also reconsidered fact witness testimony and ultimately concluded that there was preponderant evidence of a vaccine having been administered. 2014 WL 4293342.  Accordingly, even though the special master ultimately concluded that there was preponderant evidence of a vaccination having been administered, that conclusion was based on medical record notations explicitly indicating that the physicians felt the specific prior episode of GBS at issue had been a reaction to a flu vaccine.  Even after reconsideration the *Gerard* case suggests that in the context of GBS a contraindication for future flu vaccinations, or identification of the flu vaccine as an allergy, does not in itself evidence the fact of a prior vaccination having occurred.  Here, like *Gerard*, there is a notation indicating that petitioner's prior GBS was a reaction to his vaccination. (Ex. 4, p. 544; Ex. 9, p. 294.)  However, when considering the record as a whole, this case is distinguishable from *Gerard* in that for all the reasons discussed above there is not adequate evidence that the treater's conclusion was reliability reached in this case or that any flu vaccine was administered at all.

[8] *See, e.g.* "Vaccine Information Statement" for Inactivated Influenza vaccine, current edition date 8/6/2019, Centers for Disease Control and Prevention, available at www.cdc.gov/vaccines/hcp/vis/vis-statements/flu.html, last accessed on 8/6/2021.

previously suffered GBS are generally cautioned against receipt of the flu vaccine without specific respect to the underlying trigger of their prior GBS.[9]

### VI.     Conclusion

Petitioner does have my sympathy for what he endured during what was clearly a severe course of GBS.  However, for all of reasons discussed above, neither petitioner's medical records nor his affidavit, alone or in combination, provide preponderant evidence that any flu vaccination was administered to petitioner in the days, weeks, or months prior to the onset of his GBS.   Accordingly, this petition is **DISMISSED**.[10]

**IT IS SO ORDERED.**

> **s/Daniel T. Horner**
> Daniel T. Horner
> Special Master

---

[9] *See, e.g*. "Who Should and Who Should NOT get a Flu Vaccine," Centers for Disease Control and Prevention, www.cdc.gov/flu/prevent/whoshoudvax.htm, last accessed 8/18/2021.  In response to the prompt "People who should talk to their health care provider before getting a flu shot," the CDC indicates "[i]f you ever had Guillain-Barre Syndrome (a severe paralyzing illness, also called GBS). Some people with a history of GBS should not get the flu vaccine. Talk to your doctor about your GBS history."

[10] In the absence of a timely-filed motion for review of this Decision, the Clerk of the Court shall enter judgment accordingly.